## UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA ex rel. | ) | |
| CHRISTOPHER MOSLEY | ) | |
| | ) | |
| Petitioner, | ) | Case No. 05 C 248 |
| v. | ) | |
| | ) | |
| CHARLES L. HINSLEY, | ) | Judge Joan B. Gottschall |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION AND ORDER

Petitioner Christopher Mosley moves this court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. As the court has made clear, Mosley has one viable claim based on his trial counsel's ineffectiveness for failing to interview and call Keely Jones and Sharon Taylor.[1] For the reasons explained below, Mosley's petition is granted.[2]

### I. Ineffective Assistance of Counsel Claim

To establish ineffective assistance of counsel, a petitioner must demonstrate: (1) that his attorney's performance was deficient; and (2) that such representation prejudiced his case. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The first requirement is satisfied by showing that counsel's performance fell below the "objective standard of reasonableness" guaranteed under the Sixth Amendment. *Barker v. United States*, 7 F.3d 629, 633 (7th Cir. 1993) (quoting *Strickland*,

---

[1] A full discussion of the facts of this case can be found in the court's September 25, 2009 order.

[2] Respondent argues that pursuant to the United States Supreme Court's ruling in *Cullen v. Pinholster*, 131 S.Ct. 1388, 1398 (2011), the court may consider only "the record that was before the state court that adjudicated the claim on the merits." Petitioner essentially concedes this point. As a result, the court has not considered the testimony presented at the evidentiary hearing and will decide this claim based on the record before the state court.

466 U.S. at 687). To satisfy the *Strickland* prejudice element, a petitioner must demonstrate that it is reasonably likely that, but for his counsel's errors, the decision reached would have been different. *Strickland*, 466 U.S. at 696.

### 1.     Deficient Performance Under *Strickland*

Mosley's claim is that his trial counsel was ineffective in failing to call two witnesses, Jones and Taylor, to support his defense that he was across the street at the time the fire began, and did not direct his co-defendants to burn the building down. Jones states in her affidavit that she was with Mosley "during the course of the evening before the incident occurred." Jones Aff. at 1, ¶ 2. At approximately 7:45 to 8:00 p.m. that night, Jones came to the school yard and met up with several other friends, including Mosley. *Id*. at 1, ¶ 3. Jones and the others "had been there a couple of hours," when they heard someone shouting about a fire; they looked across the street and saw the building on fire. *Id*. at 1, ¶ 5. They, including Mosley, all ran across the street to see if they could help anyone; Mosley and others helped some people to safety. *Id*. at 1, ¶¶ 6-7. Jones would have testified at trial "because [Mosley] and I both know that none of the accusations against him are true, because we was [sic] together on the night in question." *Id*. at 1, ¶ 10.

Taylor's affidavit states that she was in her apartment at 7108 South Rhodes on the night of the fire. Taylor Aff. at 1, ¶ 2. Her window was open and she "never heard Mosley yelling to someone to go in and burn the building down." *Id*. at 1, ¶ 5. Taylor "did hear and see Mosley and a group of other's [sic] running from the school yard stating that the building was on fire." *Id*. at 1, ¶ 6. Mosley and others helped people, including Taylor's son, to safety. *Id*. at 1, ¶¶ 7, 8. Taylor found out that Mosley "'allegedly' told someone else to burn the building down, and 'supposedly' running around saying let the building burn." *Id*. at 1, ¶ 10. Taylor averred that she knew that was

2

not true, because "[she] witnessed Mosley and some other people run from across the street out of the school yard." *Id*. at 1, ¶ 11. Jones and Taylor's affidavits make clear that Mosley's counsel never met with them to determine what their respective testimonies would have been. Jones and Taylor averred that they, on their own initiative, approached trial counsel (either before or after a court appearance) to offer to testify on Mosley's behalf, but trial counsel never followed up with them, despite his indication to them that he would need both to testify.

The state appellate court concluded that trial counsel's decision not to call Jones and Taylor was strategic, and did not fall below an objective standard of reasonableness. The court noted that counsel presented an alibi defense by calling a different witness, Ishi Coward, who testified that petitioner was across the street from the scene of the crime and that she never heard petitioner tell anyone to burn the building down or let the building burn. Because Jones' and Taylor's affidavits, filed more than five years after the fire, indicated that they would have provided the same testimony, the court concluded that their testimony would have been cumulative to Coward's. The court further concluded that counsel's decision to call only one alibi witness was reasonable as Jones' and Taylor's testimony would have reinforced the fact that petitioner was in fact across the street from the fire, thereby strengthening the State's case against petitioner on accountability.

After reviewing the Illinois Appellate Court's decision, pertinent caselaw and the record (as it was presented to the state court), the court concludes that the appellate court's decision – that trial counsel was not ineffective for failing to interview and call Jones and Taylor – was objectively unreasonable. First, the appellate court concluded that Mosley's trial counsel decided, as a matter of strategy, not to call Jones and Taylor because their testimony would have merely been cumulative to the single witness called by Mosley's counsel. In *Washington v. Smith*, 219 F.3d 620 (7th Cir.

3

2000), petitioner argued for habeas relief based on the fact that his trial counsel failed to contact and

present the testimony of additional alibi witnesses. As in this case, Washington provided his counsel

with names of individuals who would support his alibi, but his counsel never attempted to contact

these individuals to ascertain what they might have contributed to the case. 219 F.3d at 630. In

rejecting the Wisconsin Court of Appeals' conclusion that Washington's counsel performed

effectively, the Seventh Circuit concluded that counsel's failure to investigate and call additional

alibi witnesses was deficient. *Id*. The Seventh Circuit soundly rejected the state appellate court's

conclusion concerning counsel's failure to call additional alibi witnesses.[3] In light of the fact that

Washington's counsel put on one alibi witness at trial, the state appellate court concluded that

testimony by the additional alibi witnesses never called by counsel would have been merely

cumulative to the single alibi witness' testimony. In rejecting this, the Seventh Circuit relied on the

fact that Washington's counsel called only one alibi witness whose credibility may have been

impaired because of prior convictions. 219 F.3d at 634. The court stated,

> The impact of three more witnesses corroborating Washington's alibi
> would not have been 'cumulative' as the Wisconsin Court of Appeals
> believed. Evidence is cumulative when it 'supports a fact established
> by existing evidence,' Black's Law Dictionary 577 (7th ed. 1999), but
> Washington's whereabouts on the day of the robbery was far from
> established – it was *the* issue in the case. The fact that [the sole alibi
> witness] had already testified to facts consistent with Washington's
> alibi did not render additional testimony cumulative. Indeed, the

---

[3] In *Washington*, the Seventh Circuit concluded that Washington's counsel was also ineffective for failing to read a police report and failing to subpoena a hard-to-find witness until trial already began. 219 F.3d at 632. In the end, it was the combination of errors which led the court to a finding of ineffectiveness and the court expressed no opinion on whether the errors, evaluated individually, would have constituted ineffective assistance of counsel. 219 F.3d at 634-635. However, the court relied heavily on counsel's failure to produce the additional alibi witnesses when it concluded, "All Washington needed to do was establish a reasonable doubt, and having additional, credible alibi witnesses would have covered a lot of ground toward that goal." 219 F.3d at 635.

additional testimony . . . would have added a great deal of substance and credibility to Washington's alibi. *See Montgomery v. Peterson*, 846 F.2d 407, 411-15 (7th Cir. 1988) (finding counsel ineffective for not calling additional disinterested alibi witnesses not subject to the same impeachment as family members); *Crisp v. Duckworth*, 743 F.2d 580, 585 (7th Cir. 1984) (finding that "[h]aving independent witnesses corroborate a defendant's story may be essential" and "testimony of additional witnesses cannot automatically be categorized as cumulative").

*Id*.

As in *Washington*, Mosley's counsel was deficient in failing to interview and call Jones and Taylor as alibi witnesses. Mosley explained to the state court that he told his counsel that there were a number of witnesses, including Keely Jones and Sharon Taylor, who could support his alibi defense, and the Jones and Taylor affidavits show that they themselves attempted to contact Mosley's counsel and offered to testify on his behalf. Mosley's counsel never followed up with either of these alibi witnesses. According to Mosley, after the State rested its case, Mosley's counsel informed Mosley that he intended to rest without calling a single witnesses. Only after Mosley became upset and told his counsel that he planned on telling the trial judge that he wanted to testify and call defense witnesses did trial counsel call a witness, Ishi Coward, who testified that Mosley was with her across the street at the time the fire was started, and that she never heard him threaten Fernando or make the "burn this motherfucker down" statement. Coward's testimony, for the most part, supported Mosley's defense but it was not without flaws – for example, Coward got confused by the trial judge's questioning and seemed to testify at one point that no one from the school yard, including Mosley, ever left to go to the burning building. Additional testimony from two individuals corroborating Coward's testimony that Mosley was across the street at the time the fire was started would not have been merely cumulative. As was the case in *Washington*, Mosley's whereabouts at

5

the time of the crime was "far from established – it was *the* issue in the case." *Washington*, 219 F.3d

at 634.

Finally, the court concludes that the state appellate court's conclusion that the witnesses'

testimony would have served to bolster the state's contention that Mosley was across the street was

also objectively unreasonable. Having reviewed the record of the state court proceedings, this

argument is not tenable. As was made clear by the trial judge at the conclusion of the trial and at

Mosley's sentencing, the pivotal piece of evidence connecting Mosley to the two boys who actually

started the fire was the alleged directive he gave to "burn this motherfucker down." While it is true,

as the respondent argues, that a defendant need not be present at the scene of a crime to be held

accountable for that crime, the trial judge rejected the contention that Mosley was across the street

when the fire started.[4] In finding Mosley guilty, the trial judge concluded that Mosley was at the

apartment building telling his fellow gang members to burn the building down just before they did

as they were told. The appellate court's statement that the alibi witnesses' testimony would have

supported the state's theory does not hold water. Mosley never denied that he was in the area at the

time of the fire, but rejected the state's argument that he was below Fernando's window, directing

his co-defendants to set the building on fire. Testimony by Jones and Taylor would not have

supported the state's theory, but would have solidified Mosley's alibi defense.

---

[4] Further, respondent's assertion that "it was not contested that petitioner was across the street at the time the fire was set; the only question [was] whether he was accountable for the actions of the two juveniles who set it," Answer at 28, is wrong. The trial judge stated, "The defense presented a witness who indicated that Mr. Mosley was across the street at the time. I didn't believe that. I believed the State's witnesses that he was there, that he made the comments about burning the motherfucking place down." Tr. at F34.

### 3.      Prejudice under *Strickland*

On three different occasions in its opinion, the Illinois Appellate Court applied an incorrect

standard for analyzing any potential prejudice arising from counsel's failure to call Jones and Taylor

as witnesses.  Instead of applying the "reasonable probability" standard from *Strickland*, the Illinois

Appellate Court required a showing that Mosley "was prejudiced, that is, the result of the

proceedings would have differed but for defense counsel's deficient performance." *State v. Mosley*,

No. 1-03-0134 (Ill. App. Ct. 2004) at 9.  "To show a reasonable probability of a different outcome

is a less demanding burden than to show that the outcome *would* have been different."  *Stanley v.*

*Bartley*, 465 F.3d 810, 813 (7th Cir. 2006) (italics in original).  In light of the fact that the Illinois

Appellate Court applied the wrong standard under *Strickland* to Mosley's claims, the state court's

decision is not entitled to the usual AEDPA deference, and this court must analyze prejudice *de*

*novo*, applying the correct standard.  *Martin v. Grosshans*, 424 F.3d 588, 592 (7th Cir. 2005).[5]

In order to determine if Mosley was prejudiced by his counsel's failure to call additional alibi

witnesses who would have put him across the street in the schoolyard at the time the fire was started,

the court must determine whether "there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have different," meaning "a probability

sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.  "In weighing the

effect of counsel's errors, the court must consider the totality of the evidence before the judge. . . .

[A] verdict or conclusion that is overwhelmingly supported by the record is less likely to have been

---

[5] Respondent acknowledges that the state appellate court never properly states the prejudice standard under *Strickland* in its opinion.  Despite this, respondent asserts that the state court still deserves the normal AEDPA deference because the appellate court cited to *People v. Boyd*, 807 N.E.2d 639 (Ill. App. Ct. 2004), a case which itself properly recites the prejudice standard. Respondent provides no support for this argument and the court rejects it.

affected by errors than one that is only weakly supported by the record." *Hough v. Anderson*, 272 F.3d 878, 891 (7th Cir. 2001); *Stanley*, 465 F.3d at 814 ("For the issue is not whether [petitioner] is innocent, but whether if he had had a competent lawyer he would have had a reasonable chance (it needn't be a 50 percent or greater chance . . .) of being acquitted[.]").

Given the importance of Jones and Taylor's potential testimonies and given that the evidence against Mosley was not particularly strong, the court concludes that Mosley was prejudiced by his counsel's failure to call the two witnesses. The primary witness against Mosley, Marlo Fernando, had a clear motive to lie. Fernando admitted to being involved in an ongoing dispute with Mosley over the sale of illegal drugs in the neighborhood; she also claimed that he and his fellow gang members were threatening her as a result of her refusal to pay them a tax and because she called the police every time they gathered on the corner. Clearly, Fernando had a motive for wanting Mosley incarcerated.

Further, Fernando's testimony regarding the "burn this motherfucker down" comment leads to more questions than it does answers. According to her testimony at trial, Fernando was in her apartment doing her hair with her friend. She went to her bathroom to get conditioner for her hair when she allegedly heard Mosley say, "burn this motherfucker down." This comment was the state's key piece of evidence against Mosley under an accountability theory. She then testified that she walked from the bathroom to her living room, looked out an open window, and saw Mosley standing outside alone. She then looked up and saw a group of individuals running from the schoolyard on the corner yelling that the building was on fire. She opened her front door, saw smoke in the hallway, and saw the two co-defendant boys running down the hall. Fernando's testimony presents an almost impossible factual scenario. First of all, if Fernando's version of events is to be believed,

the following must have happened: in the time it took her to walk from her bathroom (where she allegedly heard Mosley say "burn the motherfucker down") to her living room, the two boys who lit the fire ran from below her window (where they were allegedly getting the directive from Mosley to start the fire) into the apartment building, ran up the stairs to the second floor, poured gasoline in the opening to the second floor hallway, and lit the fire. Fernando claimed that when she looked out her living room window and identified Mosley, she saw a group of people running towards her building from the schoolyard yelling that the building was on fire. So, in the time it took Fernando to walk from her bathroom to her living room, Mosley gave the directive, the boys ran into the building, threw the gasoline, lit the fire, and the fire progressed so that smoke was visible to the crowd of people across the street in the schoolyard.[6] Mosley's position, which more logically fits the facts, is that he made a statement (Officer Tovar claims Mosley told him he said "let it burn") after he came upon the building that was already on fire. Mosley claims he was with the group at the schoolyard and came running across after they noticed that the building was on fire.

Respondent argues that Mosley cannot show prejudice because even if Jones and Taylor had testified that Mosley was across the street until the group saw the fire, "their testimony would in no way have negated petitioner's guilt on an accountability theory." Answer at 34. Respondent goes on to state that "to prove petitioner's guilt on an accountability theory, the State did not need to introduce direct evidence that petitioner ordered his juvenile associates to burn down the building, and therefore neither Jones's nor Taylor's testimony would have been exculpatory. In short, neither Jones's nor Taylor's testimony contradicted the State's theory of the case." *Id*.

---

[6] In addition, testimony by Ledbetter (who was in Fernando's apartment at the time of the incident) actually supports the defense. She testified that she noticed "people were yelling fire, fire, fire," *and then* she went to the window and saw Mosley standing below "yelling burn this down."

Respondent's assertion seems to be that even if Mosley had not made the statement at issue and was indeed across the street at the time the fire was set, he still would have been found guilty. While that type of argument may be appropriate where petitioner had a jury trial and the court has no way of knowing how the jury reached its decision, it misses the mark in a case such as this one, where the trial judge gave detailed reasons for his finding of guilty. Having reviewed the record thoroughly, it is clear that the lynchpin of the prosecution's case, and the fact that tied Mosley to the actions of his two co-defendants, was the "burn this motherfucker down" comment. To say that the trial judge relied on the "burn this motherfucker down" statement heavily would be an understatement. He quoted it numerous times in his pronouncement of guilt and at Mosley's sentencing. The trial judge, when discussing defense counsel's assertion that any statement made by Mosley was made after coming upon a fire *already* set, specifically found that Mosley was below Fernando's window *before* the fire was set, and that the "burn the motherfucker down" comment was indeed a directive to the two boys. Tr. at C49 (Trial Judge: "In this particular case the circumstantial evidence establishes in my opinion that the comments about burn this motherfucking building down was [sic] made before the fire started."); C45 (Trial Judge, on the "burn this motherfucker down" statement: "I don't believe he was talking to himself. He was talking to some other people that were out there: Burn that motherfucking building down."); F32 (Trial Judge: "Fernando, she heard Mosley's voice from outside saying to someone based on the evidence, he wasn't talking to himself, saying to someone which turned out to be Rosemond and the other guy, burn the motherfucking place down."); F33 ("You put all that evidence together, it was clear to me at least that circumstantially the State proved beyond a reasonable doubt to me that Mosley was the one who gave the direction to burn, pardon the language, to burn the motherfucking place down in an effort

10

to get back at Marlo Fernando for either not paying the taxes or calling the police or a combination of both"). Therefore, evidence that Mosley was across the street and did not make the statement would have directly contradicted the judge's conclusions. With that in mind, the court cannot agree with the respondent that, even if the court would have heard the alibi witnesses' testimony (and believed them), the outcome would have been the same. The court also acknowledges that there was testimony from Detective Tovar that, after the fire, Mosley admitted that he told Fernando that he would "burn her out." While this testimony was an additional piece of evidence relied on by the trial judge, a review of the record makes clear that the judge was most swayed by Fernando's testimony regarding the "burn the motherfucker down" comment. Even with the Tovar testimony, it is reasonably probable that the testimony of two additional alibi witnesses would have caused reasonable doubt in the mind of the trial judge and changed the outcome of this case.

In determining the strength of the evidence against Mosley, the court is mindful that Mosley elected to waive his right to a jury trial, and instead opted for a bench trial. In light of this, comments made by the trial judge at Mosley's sentencing are particularly pertinent. After denying Mosley's motion for a new trial, the trial judge stated:

THE COURT: Let me say this. Basically, when you come to room 303, what you see is what you get. I was somewhat troubled by the way that the case of Christopher Mosley was tried overall. I'm not saying anything by that, that tried somewhat differently the result would have been different. Pure speculation on my part, no way of saying that would have happened or not.

But the trial consisted of the opening statement regarding Mr. Mosley by the defense, approximately 5 minutes, 5 lines, of course doesn't mean if it was longer it would have made a difference. But I'm merely saying that. Carol Wilson the life and death witness, appropriate, there was no cross examination. There was none of Keith Gajeski, G-a-j-e-s-k-I, the fire-fighter who came to the scene. Those people's testimony took approximately from pages 7 through 10 for the first witness and 12 through 27 for the second one.

Fire Lieutenant George Healy testified for 7 pages of transcript with no cross examination. There was none for Detective John Schmitz who testified for approximately 10 pages and Robert Tovar who testified for give or take, 9 pages overall.

So it was 2 or 3 pages of cross examination. As far as Marlo Fernandez testified for 21 pages of transcript, the cross was 2 pages, for Ishi Coward, a defense witness, I won't count that for a minute, Leadbetter testified for approximately 6 pages of transcript. And the cross was approximately 2 to 3 pages. There was stipulated evidence from 1, 2, 3, 4, 5, 6, from 9 witnesses.

I'm not suggesting that that means anything at all about the way I think Mr. Strunk tried the case. It wasn't meant for that purpose. What it illustrates to me in a given case is that sometimes one side or the other either over-evaluates their case or under-evaluates their case. The entire transcript of the trial of Christopher Mosley if you put it all together would be give or take 75 pages or so. It doesn't mean it's a slight to Mr. Struck, not suggesting he was ineffective or not. But I'm just suggesting this, that perhaps in any given case, perhaps in the case of Christopher Mosley, one side or the other will often times either under-evaluate the evidence in the case or over-evaluate the evidence in the case. And maybe that occurred in this case regarding the evaluation of the evidence against Mr. Christopher Mosley.

But having said all that, what I'm merely saying is this additionally to that. I'm a firm believer in the jury system. However, when a person asks me for bench trial, what he's telling me is he wants my opinion based on the evidence presented as to whether or not I am convinced beyond a reasonable doubt the State established the charge against him.

In regard to Christopher Mosley, based on the evidence presented to me, I am convinced beyond a reasonable doubt that he was guilty of the charge against him. So the motion for new trial is respectfully denied.

MR. STRUNK:     May I comment.

THE COURT:     You may.

MR. STRUNK:     You just indicated you're a firm believer in the jury system. That's well and good, that's fine. Then you also intimated or said directly you counted pages, number of pages of cross examination. Some of those witnesses a fire-fighter, he has no - - nothing to incriminate Christopher Mosley. Many of the witnesses the State called, you read the transcript, they don't incriminate

|  | Christopher Mosley. |
|---|---|
| THE COURT: | I understand that. I'm not suggesting that. |
| MR. STRUNK: | What would be the point of cross examination of a firefighter? How many years have you been on the job? Those people they offered no evidence which would incriminate or they've offered no evidence at all which would incriminate Christopher Mosley as guilty of murder on a theory of accountability. So all those civilian witnesses, Christopher Mosley's position is I never made any statements to Officer Tovar. That's his position for the record. Your Honor has indicated to me you're a firm believer in the jury system which indicates to me that your Honor couldn't be fair on a bench trial. |
| THE COURT: | Mr. Strunk, Mr. Strunk. Are you serious about that comment? |
| MR. STRUNK: | You were the one that brought it up. You're the one that said you're a firm believer in the jury system. I didn't bring it up in that context. This if I thought I couldn't be fair to your client I would have said so. |
| THE COURT: | All I was saying I was trying to make a point that for a serious case, I looked at the transcript and I felt it was a relatively brief transcript. Does not mean to me nor should it mean to you that I'm suggesting that you did anything you should not have done, that you did things you should not have done. As I said before, when you come to room 303 what you get is what you see and I felt it was appropriate to comment on what I commented about. There was no slight on you whatsoever. |
|  | By me saying I'm a firm believer in the jury system I certainly am. Doesn't mean if you take a bench trial you'll be found guilty. If you certainly thought so you could have taken a jury trial if you wanted to. When a person takes a bench trial he asks the Judge for his opinion. Mosley asked me for it. My comments about over-evaluating or under-evaluating the case, that's my personal opinion. Perhaps the case was under-evaluated for one side or the other, that's all. |
| MR. STRUNK: | If it's under-evaluated on my part, you should grant the motion for new trial. If you feel that I under-evaluated this case basically you're saying in so many words it's ineffective assistance. |
| THE COURT: | Not what I'm saying at all. Anything else Mr. Strunk? |
| MR. STRUNK: | Nothing whatsoever. |

10/15/99 Tr. at F12-F17.

After pointing out how little cross-examination Mosley's counsel did, the judge, in a highly unusual speech, repeatedly stated that "one side or the other will often times either under-evaluate the evidence in the case or over-evaluate the evidence in the case. And maybe that occurred in this case regarding the evaluation of the evidence against Mr. Christopher Mosley." 10/15/99 Tr. at F14. While the judge stopped short of actually saying that Mosley's counsel rendered ineffective assistance of counsel, it is clear from the judge's remarks that he was "troubled" by counsel's performance. The court finds the trial judge's comments support its conclusion here. Clearly, the trial judge, while he ultimately found Mosley guilty, expressed serious misgivings over the handling of the case.

It is reasonably probable that, against this backdrop, additional witnesses placing Mosley across the street at the time the fire started, and confirming that he came across the street to the apartment building only when he saw it was on fire, would have changed the outcome in this case. Without the testimony of Jones and Taylor, Mosley's defense rested solely on the somewhat confused testimony of Ishi Coward. Importantly, Jones and Taylor's testimony would have bolstered his theory of defense, and "would have added a great deal of substance and credibility" to Mosley's other alibi witness. *Washington*, 219 F.3d at 634. This testimony would have directly contradicted the key piece of evidence against Mosley, which was so heavily relied upon by the trial judge, that Mosley gave the directive to "burn this motherfucker down." As the Seventh Circuit has stated, petitioner need not show that he is innocent. *Stanley*, 465 F.3d at 814. Rather, he must show that "if he had had a competent lawyer he would have had a reasonable chance (it needn't be a 50 percent or greater chance . . .) of being acquitted[.]" *Id.* In light of the above, the court concludes that there

14

is a reasonable probability that, had additional alibi witnesses been presented, the outcome of the trial would have been different.

**IV.      Conclusion**

In accordance with 28 U.S.C. § 2254(d), the court grants Christopher Mosley's petition for a writ of habeas corpus and orders respondent to release Mosley from custody unless, within 30 days from the entry of this order, the State of Illinois announces its intention to retry Mosley or files a notice of appeal.

Enter:           /s/        
        JOAN B. GOTTSCHALL
        United States District Judge

Date: August 26, 2011