# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **CHRISTOPHER MOSLEY,** | ) | |
| **Petitioner,** | ) | **Case No. 05 C 248** |
| | ) | |
| **v.** | ) | **Judge Joan B. Gottschall** |
| | ) | |
| **CHARLES HINSLEY, Warden,[1]** | ) | |
| **Respondent.** | ) | |

## MEMORANDUM OPINION AND ORDER

Sixty-eight year old Zulean Wilson died after two boys poured gasoline in the stairwell of her South Side Chicago apartment building and set it on fire. After a bench trial, the state court concluded Christopher Mosley told the boys to start the fire and found him guilty of first-degree murder and aggravated arson based on accountability. After unsuccessfully pursuing state court remedies, Mosley filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 contending his trial counsel's performance was constitutionally ineffective. In 2010, this court held an evidentiary hearing but after the Supreme Court issued its decision in *Cullen v. Pinholster*, 131 S.Ct. 1388 (2011), decided to proceed on the state court record. Based on the state court's assumption that affidavits submitted by two alibi witnesses were true, the court concluded the state court's rejection of Mosley's ineffective assistance of counsel claim was objectively unreasonable. The Seventh Circuit agreed but remanded so this court could make findings of fact and determine, based on evidence not before the state court, if habeas relief was warranted. The parties requested that the court rule based on the 2010 evidentiary hearing. For

---

[1] Mosley is incarcerated at the Menard Correctional Center. During this case's lifespan, the warden there has changed multiple times. The current warden is Rick Harrington. Accordingly, Rick Harrington is hereby substituted as the respondent. *See* Rule 2 of the Rules Governing Section 2254 Cases in the United States District Courts; *Rumsfeld v. Padilla*, 542 U.S. 426, 436 (2004).

the following reasons, the court agrees that no further proceedings are necessary and grants Mosley's petition.

## I.    Procedural Posture

### A.    State Proceedings

In May of 2000, following a bench trial in the Circuit Court of Cook County, the trial judge found Mosley guilty of first-degree murder and aggravated arson based on accountability. Mosley was sentenced to consecutive prison terms of 60 and 15 years, respectively. He appealed, arguing (among other things) that the evidence was insufficient. On February 6, 2002, the appellate court affirmed. Mosley did not file a petition for leave to appeal ("PLA") with the Illinois Supreme Court.

On September 5, 2002, Mosley filed a pro se post-conviction petition in the Circuit Court of Cook County claiming his trial counsel's failure to call two alibi witnesses (Keely Jones and Sharon Taylor) violated his Sixth Amendment right to effective assistance of counsel. On November 13, 2002, the trial court determined that counsel's decision not to call the alibi witnesses was strategic and had they been called to testify, the result would have been the same. It thus summarily dismissed the petition as frivolous. *See People v. Mosley*, No. 1-03-134, at 7 (Ill. App. Jun. 2, 2004) (unpublished order).

On July 17, 2003, Mosley appealed and on June 2, 2004, the appellate court affirmed, finding that counsel's decisions were reasonable, the alibi witnesses' testimony was cumulative, and the failure to call the witnesses was not prejudicial. *Id*. at 8-12. On July 8, 2004, Mosley filed a PLA with the Illinois Supreme Court repeating his ineffective assistance of counsel claim. On October 6, 2004, the Illinois Supreme Court denied the PLA.

### B.       Federal Proceedings

On January 14, 2005, Mosley filed a federal pro se habeas petition repeating his argument that the failure to call two alibi witnesses violated his Sixth Amendment right to effective assistance of counsel.  After requiring the respondent to file the entire state court record, the court appointed counsel for petitioner, who filed an amended petition.  Counsel pursued limited discovery and filed a second amended petition.  The court found that an evidentiary hearing was necessary and after allowing additional discovery, held a hearing.

While the case was under advisement, the Supreme Court issued its opinion in *Cullen v. Pinholster*, 131 S.Ct. 1388 (2011).  After considering the opinion and submissions from the parties, the court decided to rule based on the state court record.  The court accepted the state court's assumption that the affidavits from the two alibi witnesses were true and held that the state court's rejection of Mosley's ineffective assistance claim was objectively unreasonable.  On appeal, the Seventh Circuit agreed but remanded so this court could make findings of fact and determine, based on evidence not before the state court, if Mosley was entitled to habeas relief. *Mosley v. Atchison*, 689 F.3d 838 (7th Cir. 2012).  The parties requested that the court rule based on the 2010 evidentiary hearing.  The court agrees that no further proceedings are necessary as the present record is sufficient for the court to rule.  It thus turns to the facts adduced during the state court trial and the evidentiary hearing before this court.

## II.      Facts

### A.       The State Court Trial

Mosley agreed to a bench trial before Judge Stanley Sacks in the Circuit Court of Cook County.  At trial, Mosley was represented by Cook County Public Defender Robert Strunk.

Marlo Fernando, who had known Mosley since sixth or seventh grade, was the state's first witness. Fernando sold drugs out of her second-floor apartment at 7108 South Rhodes Avenue on Chicago's South Side. Mosley belonged to the Gangster Disciples, the prevalent street gang in the area. Members of the Gangster Disciples sold drugs inside and outside the building and Mosley sold drugs from the nearby corner of 71st Street and Rhodes Avenue.

In the summer of 1997, Mosley told Fernando she needed to pay taxes to the Gangster Disciples based on her drug sales. After Fernando refused, her car window was smashed. Fernando confronted Mosley, who told her she would get reimbursed for repairs if she stopped selling drugs. When Fernando did not receive money for her window, she began calling the police every time she saw Mosley and his friends, including 14-year old co-defendant Anthony Rosemond and 13-year old co-defendant Matthew Wilson, near her building.

Fernando testified that after she began calling the police about two weeks prior to the fire, she heard Mosley say at least five times that he was going to kill her. Earlier on the day of the fire, Fernando heard Mosley say he was going to "kill that B." State Tr. B22. Immediately before she realized her building was on fire, she was in the bathroom of her apartment conditioning her hair. She testified that her bathroom window was open and she heard Mosley say, "[B]urn this motherfucker down." *Id*. at B21. Fernando walked to the front room, looked out the window, saw Mosley standing outside, and saw children running toward the building from the nearby school lot yelling that the building was on fire. She opened her door and saw Rosemond and Wilson run past her door in a smoke-filled hallway. Upon exiting the building, she saw Wilson laughing. After helping someone inside the building escape, Mosley approached Fernando and said, "[T]his was a GD hit and we gone kill you, bitch" and "it's not over." *Id*. at

B24.  On cross-examination (which spans slightly over one page in the transcript, *id*. at B25),

Strunk did not inquire about Fernando's drug dealing, her personal animosity against Mosley, or

the basis for her statements about the workings of the Gangster Disciples street gang.

Nailal Ledbetter, a friend of Fernando's, also testified for the state as part of its rebuttal

case.  She was at Fernando's apartment on the evening of the fire.  At approximately 7:00 or

7:30 p.m., Ledbetter heard Mosley yell, "[F]uck that bitch.  You all letting one bitch stop you all

from making you all money."  *Id*. at C22.  Mosley also said, "I'm not going to let one bitch stop

me from making my money," "I'm not scared of the police," and "she got guns.  We got guns,

too."  *Id*.  Ledbetter testified that when the fire started between 10:00 and 10:30 p.m., she heard

people yelling, "fire, fire, fire."  *Id*. at C25.  Fernando was "in the bathroom doing her hair."  *Id*.

at C23.  Ledbetter went to the window.  As Mosley ran past, he "looked up and said burn this

mother fucker down."  *Id*. at C23-24.

Officer Robert Tovar testified Mosley was brought into the police station the day after

the fire.  Mosley acknowledged his ongoing poor relationship with Fernando and admitted he

told Fernando "he would burn her out."  *Id*. at A53.  According to Tovar, Mosley also admitted

that on the night of the fire, he said "let it burn" until he saw people being injured as a result of

the fire.  *Id*.

After the close of the prosecution's case, Mosley's counsel unsuccessfully moved for a

judgment of acquittal.  Although he had not planned on calling any witnesses, after the motion

for a judgment of acquittal was denied, he considered calling Fernando.  *Id*. at A61.  However,

he had not issued a subpoena compelling her presence.  He ultimately decided to call Ishi

Coward as the sole defense witness.[2]

At 7:00 or 7:30 p.m on the evening of the fire, Coward, Mosley, and a small group of adults and children were standing outside 7108 South Rhodes Avenue waiting for one of Coward's relatives.  After about five minutes, the group crossed the street and went to the schoolyard at 70th Street and Rhodes Avenue.  At approximately 10:30 p.m., the group noticed flames emanating from 7108 South Rhodes Avenue.  Coward testified that once they saw that the building was burning, they all ran towards it as friends and relatives lived there.  *Id*. at C7, C15.  Coward also testified that Mosley stayed in the schoolyard once the fire started.  *Id*. at C9-10, 13-14.

At the conclusion of Coward's direct testimony, the trial judge asked Coward to clarify whether Mosley left the schoolyard after the fire started.  Coward said Mosley was never at 7108 South Rhodes Avenue while the building was on fire, *id*. at C15, but later reiterated that Mosley crossed the street with the rest of the group from the schoolyard after the fire started, *id*. at C15-C16.  According to Coward, she was with Mosley before, during, and after the fire and never heard him tell anyone to burn the building down or let it burn.

Under Illinois law, Mosley was "accountable" for the murder and arson if, either before or during the commission of the offense, he solicited, aided, abetted, agreed, or attempted to aid another in the planning or the commission of the offense. 720 Ill. Comp. Stat. § 5/5–2; *People v. Perez*, 725 N.E.2d 1258, 1264 (Ill. 2000).  Based on Fernando's version of events, the state's theory was that Mosley ordered Rosemond and Wilson, two younger gang associates, to set the

---

[2]   Coward's first name is spelled Esha, Isha, and Ishi at different points in the state and federal court record.  Coward spelled her first name Ishi when identifying herself during the state court trial so the court will do the same.  State Tr. C3.

building on fire.  Judge Sacks found Mosley guilty of first-degree murder and aggravated arson based on accountability.

In finding Mosley guilty, the trial judge stated, "There is no question in my mind based on the credible evidence in this case that the defendant was acting in concert with the two people who were in the apartment building who went to the second floor who the evidence shows splashed gasoline on the door leading to the apartment on the second floor and torched it up." *Id.* at C56.  He then concluded that Mosley and the two accomplices "planned to take out Marlo Fernando and unfortunately for Ms. Zuling Wilson she was taken out instead of Marlo Fernando."  *Id.*

Mosley sought a new trial, arguing the evidence showed that by the time he was standing in front of the building, it was already engulfed by flames.  The trial judge denied the motion, stating:

> THE COURT:  Let me say this. Basically, when you come to room 303, what you see is what you get.  I was somewhat troubled by the way that the case of Christopher Mosley was tried overall. I'm not saying anything by that, that tried somewhat differently the result would have been different.  Pure speculation on my part, no way of saying that would have happened or not.  But the trial consisted of the opening statement regarding Mr. Mosley by the defense, approximately 5 minutes, 5 lines, of course doesn't mean if it was longer it would have made a difference. But I'm merely saying that.  Carol Wilson the life and death witness, appropriate, there was no cross examination.  There was none of Keith Gajeski, G-a-j-e-s-k-i, the fire-fighter who came to the scene.  Those people's testimony took approximately from pages 7 through 10 for the first witness and 12 through 27 for the second one.
>
> Fire Lieutenant George Healy testified for 7 pages of transcript with no cross examination.  There was none for Detective John Schmitz who testified for approximately 10 pages and Robert Tovar who testified for give or take, 9 pages overall.  So it was 2 or 3 pages of cross examination. As far as Marlo Fernandez testified for 21 pages of transcript, the cross was 2 pages, for Ishi Coward, a defense witness, I won't count that for a minute, Leadbetter [sic] testified for

approximately 6 pages of transcript. And the cross was approximately 2 to 3 pages. There was stipulated evidence from 1, 2, 3, 4, 5, 6, from 9 witnesses.

I'm not suggesting that that means anything at all about the way I think Mr. Strunk tried the case. It wasn't meant for that purpose. What it illustrates to me in a given case is that sometimes one side or the other either overevaluates their case or under-evaluates their case. The entire transcript of the trial of Christopher Mosley if you put it all together would be give or take 75 pages or so. It doesn't mean it's a slight to Mr. Struck, not suggesting he was ineffective or not. But I'm just suggesting this, that perhaps in any given case, perhaps in the case of Christopher Mosley, one side or the other will often times either under-evaluate the evidence in the case or over-evaluate the evidence in the case. And maybe that occurred in this case regarding the evaluation of the evidence against Mr. Christopher Mosley.

But having said all that, what I'm merely saying is this additionally to that. I'm a firm believer in the jury system. However, when a person asks me for bench trial, what he's telling me is he wants my opinion based on the evidence presented as to whether or not I am convinced beyond a reasonable doubt the State established the charge against him. In regard to Christopher Mosley, based on the evidence presented to me, I am convinced beyond a reasonable doubt that he was guilty of the charge against him. So the motion for new trial is respectfully denied.

MR. STRUNK: May I comment.

THE COURT: You may.

MR. STRUNK: You just indicated you're a firm believer in the jury system. That's well and good, that's fine. Then you also intimated or said directly you counted pages, number of pages of cross examination. Some of those witnesses a firefighter, he has no – nothing to incriminate Christopher Mosley. Many of the witnesses the State called, you read the transcript, they don't incriminate Christopher Mosley.

THE COURT: I understand that. I'm not suggesting that.

MR. STRUNK: What would be the point of cross examination of a firefighter? How many years have you been on the job? Those people they offered no evidence which would incriminate or they've offered no evidence at all which would incriminate Christopher Mosley as guilty of murder on a theory of accountability. So all those civilian witnesses, Christopher Mosley's position is I never made any statements to Officer Tovar. That's his position for the record. Your Honor has indicated to me you're a firm believer in the jury system which indicates to me that your Honor couldn't be fair on a bench trial.

THE COURT: Mr. Strunk, Mr. Strunk. Are you serious about that comment?

MR. STRUNK: You were the one that brought it up. You're the one that said you're a firm believer in the jury system. I didn't bring it up in that context. That if I thought I couldn't be fair to your client I would have said so.

THE COURT: All I was saying I was trying to make a point that for a serious case, I looked at the transcript and I felt it was a relatively brief transcript. Does not mean to me nor should it mean to you that I'm suggesting that you did anything you should not have done, that you did things you should not have done. As I said before, when you come to room 303 what you get is what you see and I felt it was appropriate to comment on what I commented about. There was no slight on you whatsoever. By me saying I'm a firm believer in the jury system I certainly am. Doesn't mean if you take a bench trial you'll be found guilty. If you certainly thought so you could have taken a jury trial if you wanted to. When a person takes a bench trial he asks the Judge for his opinion. Mosley asked me for it. My comments about over-evaluating or under-evaluating the case, that's my personal opinion. Perhaps the case was under-evaluated for one side or the other, that's all.

MR. STRUNK: If it's under-evaluated on my part, you should grant the motion for new trial. If you feel that I under-evaluated this case basically you're saying in so many words it's ineffective assistance.

THE COURT: Not what I'm saying at all. Anything else Mr. Strunk?

MR. STRUNK: Nothing whatsoever.

*Id*. at F12-F17.

The judge then proceeded to sentencing. He acknowledged that Fernando was "not a pillar of virtue." *Id*. at F31. He nevertheless found that her testimony that Mosley ordered his co-defendants to "burn the mother fucking place down" was credible and the fire flowed from Mosley's effort to stop Fernando from thwarting the Gangster Disciples' drug sales by calling the police and/or punish her for not paying taxes on her drug sales. *Id*. at F32-33. He also stated he did not believe Coward's testimony that Mosley was in the schoolyard for at least three hours

before the fire started.  Ultimately, Mosley was sentenced to consecutive prison terms of 60 and 15 years, respectively, for first-degree murder and aggravated arson based on accountability.

**B.        The Federal Evidentiary Hearing**

As noted above, the state trial court rejected Mosley's post-conviction petition summarily after assuming his new evidence (affidavits from putative alibi witnesses Keely Jones and Sharon Taylor) was true.  Jones, Taylor, and Mosley's trial counsel testified during an evidentiary hearing before this court in 2010.  After the Supreme Court's decision issued in *Cullen v. Pinholster*, 131 S.Ct. 1388 (2011), the court granted § 2254 relief based on the state court record.  The respondent appealed.  The Seventh Circuit noted, "[t]he district court and we agree that the state courts erred . . . but that does not mean the Jones and Taylor affidavits are actually true or that they provide the complete picture of the facts relevant to Mosley's claim of ineffective assistance of counsel."  *Mosley v. Atchison*, 689 F.3d at 853.  It then directed this court to make findings of fact and determine if those facts demonstrated Mosley's trial counsel was ineffective.  With this purpose in mind, the court turns to the witnesses' testimony from the 2010 federal evidentiary hearing.

*Keely Jones*

Jones was Mosley's longtime friend and neighbor and was close to his extended family.  She was aware that Mosley sold drugs and belonged to the Gangster Disciples and had heard neighborhood gossip about Fernando's drug sales.  During the summer of 1997, she observed Mosley and Fernando arguing and cursing at each other approximately five times.  On one occasion, Jones heard Fernando warn Mosley to watch his back.  She believed Mosley and Fernando bitterly hated each other.

According to Jones, shortly before 8 p.m. on August 15, 1997, she parked in front of her house, which was across the alley from 7108 South Rhodes Avenue. She exited the car with her 1-year old daughter and joined Mosley, Coward, and others who were "hanging out" in the nearby schoolyard enjoying the summer evening. Fed. Tr. 23. Jones testified Mosley was with her the entire time she was in the schoolyard.

The group stayed at the schoolyard until they noticed that the building at 7108 South Rhodes Avenue was on fire. Alarmed by the fire, they ran across the street. From her vantage point on the sidewalk in front of the building where she was standing holding her daughter, Jones saw residents hanging out of windows screaming for help. Jones then saw Mosley run inside the burning building to assist in rescue efforts. Jones estimated he was inside for approximately ten minutes.

After Jones learned of Mosley's arrest, she visited Mosley in jail. Mosley told Jones he believed Marlo Fernando set him up and asked Jones to contact his attorney, Robert Strunk. Jones called Strunk twice. As she was unable to reach him, she left messages stating she was with Mosley on the night of the fire and offering to testify. Jones also accompanied Mosley's mother to several of Mosley's court hearings. She could not recall the nature of the hearings but testified that she met Strunk in the hallway two or three times. After she again offered to testify on Mosley's behalf at trial, Strunk said he would contact her. Neither Strunk nor an investigator followed up.

Jones recalled receiving an affidavit in the mail detailing her observations on the night of the fire. The affidavit contained several blanks. She filled in the blanks, signed the affidavit,

and returned it to the sender, but could not recall who that was. Jones wrote at least one letter to Mosley while he was incarcerated but at the evidentiary hearing, did not recall doing so.

_Sharon Taylor_

Sharon Taylor also testified at the evidentiary hearing. In 1997, Taylor lived at 7108 South Rhodes Avenue in a third-floor apartment directly above Fernando's apartment. The apartments were on the corner and had windows overlooking both 71st Street and Rhodes Avenue. Taylor knew Mosley because he was a high school classmate and lived in the building next door.

On the day of the fire, Taylor was at her apartment watching television with her young son. The windows were open as her apartment was not air-conditioned. Mosley visited Taylor's apartment, stayed for 10 to 15 minutes, and offered to bring her ribs for dinner. On direct examination, Taylor testified that she was not sure when Mosley visited but believed it was after 6:00 p.m. During her cross examination, Taylor agreed Mosley visited her between 9:30 and 9:45 p.m. After Mosley left, Taylor looked out her window for approximately two minutes. While she could see portions of the schoolyard, the parties stipulated that part of the school building and schoolyard was obscured from view. She saw Mosley cross the street to the schoolyard and join a group of men and children. Taylor did not recall seeing any adult females.

Taylor returned to her television program but after a few minutes, decided to give her son a bath. She could not see outside during the 10-15 minutes it took to bathe her son, but could hear what was happening except when the water was running. After the bath, Taylor continued to watch television in her living room. She testified she would have heard loud voices outside

but did not hear any yelling or threats. She also testified that if she had heard anyone threaten to burn the building down, she would have been concerned and would have immediately investigated by looking out the window.

Taylor continued to watch television and eventually smelled smoke. She opened the front door of her apartment, saw a cloud of smoke, closed the door, and took her son to her kitchen window, which faced 71st Street. She saw Mosley and others running from the schoolyard and heard them yell that the building was on fire. Mosley asked her to drop her son from the window. She complied and Mosley and two of his friends caught him safely. Mosley then told Taylor to jump but she refused, saying she was afraid.

Next, she saw Mosley run around to the front of the building. Taylor very briefly lost sight of Mosley but otherwise saw him standing outside for approximately five minutes, until she was rescued by fire fighters. She did not see Mosley enter the building after the fire started. The morning after the fire, Taylor and Mosley returned to Taylor's apartment to retrieve some of Taylor's possessions. Taylor saw Fernando talking to police outside the building and pointing at Taylor and Mosley.

While Mosley was incarcerated at Cook County jail, Taylor visited him, called him on the telephone, and corresponded with him. Mosley asked her to call his lawyer, Robert Strunk. Taylor testified that she called Strunk three or four times and left a message each time saying she was calling about Mosley and identifying herself as a resident of the apartment building that was on fire. Although Taylor left her contact information, Strunk did not return her calls. Taylor neither spoke with Strunk nor met him in person, and no one associated with the case contacted her.

Taylor signed an affidavit stating, in pertinent part, that: (1) she never heard Mosley order anyone to set the apartment building on fire; (2) after the building caught fire, she saw Mosley run from the schoolyard towards the building as he yelled that the building was on fire; (3) she visited Mosley in jail after his arrest to find out why he was incarcerated; (4) after she learned about the criminal charges, she offered to testify on Mosley's behalf; and (5) Mosley provided Strunk's contact information and although she was unable to reach Strunk by phone, she ran into him at a hearing and after speaking with her, Strunk promised to call her as a witness but never did so.

During her deposition and the evidentiary hearing before this court, Taylor admitted she never spoke with Strunk and the portions of her affidavit detailing her conversation with him were false. She also testified that Mosley drafted the affidavit for her. She understood the gravity of a sworn affidavit in a murder case but signed it without correcting inaccuracies to help Mosley.

*Robert Strunk*

Strunk graduated from law school in 1979 and was admitted to the Illinois bar in 1980. He joined the Cook County Public Defender's Office in 1981 and has spent his entire career as a public defender. In 1989, he became a member of the Cook County Public Defender's murder task force, where he focused on defending capital and non-capital murder cases. He has defended clients in approximately 100 jury trials, handled numerous capital cases, and regularly attends continuing legal education seminars about criminal defense issues. Prior to representing Mosley, Strunk estimated he tried at least 50 jury and bench trials in murder cases.

Strunk represented Mosley from approximately August of 1997 through November of 1999. To prepare for trial, he visited Mosley in jail and spoke with him at least three times per month on the telephone. He also subpoenaed police records. Strunk was aware that Mosley was involved with the Gangster Disciples and had prior felony convictions. In response to a discovery request in Mosley's federal § 2254 proceedings, Strunk provided his file from Mosley's state court case but was unsure if it was complete.

In May of 1997, Strunk amended his answers to discovery by adding Ishi Coward and Sharon Taylor as potential witnesses. His records showed that he asked an investigator from his office to contact Coward and Taylor to explore their possible testimony. His practice was to ask investigators to prepare written reports summarizing conversations that were favorable to his client but orally report findings that appeared to be adverse. The file did not contain interview notes for Coward or Taylor. Strunk's notes also indicated that two of Coward's relatives could be potential witnesses. He did not recall speaking to Keely Jones.

Prior to trial, Strunk reviewed documents produced by the state and grand jury transcripts. These materials included notes summarizing detectives' interviews with Fernando and Ledbetter as well as a statement from one of Mosley's co-defendants. In addition, Strunk reviewed two statements made by Mosley following his arrest after he waived his *Miranda* rights. In the first statement, Mosley stated that he argued with a girl in the apartment building approximately eight hours before the fire. He "said some bad things to the girl" but did "not remember if he said her building should be put . . . on fire" and "if he did say that, he did not intend for someone to go out and set the building on fire." *Id*. at 185-86. In a second statement, Mosley admitted he argued with Fernando on the day of the fire. He "stated that while the

building was burning he did say, 'let the mother fucker burn, let the mother fucker burn.'" *Id.* at 188.

Strunk's defense theory was that "no evidence" showed that Mosley conspired with the two juveniles who set the fire. *Id.* at 152. As Strunk explained:

> There's not a shred of evidence, and there isn't today, that they introduced at that trial that Christopher Mosley ordered this, that Christopher Mosley told those kids to do this. There was no evidence adduced at this trial that Christopher Mosley aided and abetted anything. I argued that he was running his mouth . . . . The strategy is that we're going to beat this case because you're not accountable. They can't prove you aided and abetted anything because they have no conversations with you and these two juveniles.

*Id.* On cross-examination during the federal evidentiary hearing, Strunk reiterated that, "There was no evidence whatsoever that [Mosley] ordered those juveniles to set this fire.' *Id.* at 194.

Strunk also recalled thinking Fernando was "one of the worst witnesses" he had "ever seen as far as demeanor and arrogance," was "incredible from the start" and "nasty." *Id.* at 155. Part of his strategy was to avoid testimony about the feud between Fernando and Mosley as he believed that evidence about their poor relationship could provide a motive for Mosley to commit the offense. On cross-examination, however, he conceded that evidence about the relationship could also establish a reason for Fernando to be untruthful about events on the day of the fire.

Strunk testified he did not plan to call any witnesses because he was convinced the trial judge would grant his motion for a judgment of acquittal at the close of the evidence. He recalled the prosecutors' response to this motion and their argument that Fernando's testimony was enough to sustain the verdict, and felt they were "shocked" when the court denied the motion. *Id.* at 196. After this ruling, Strunk asked the court for a short continuance, spoke with

Coward, and decided to call her as a witness because her testimony placed Mosley at the schoolyard for the entire evening.

At the evidentiary hearing, Strunk testified that he believed that putting on witnesses who contradicted Coward would undermine his theory that Mosley was at the schoolyard when the fire started and thus could not have been outside the building ordering his co-defendants to set the fire. Although he did not recall speaking with Taylor, he thought her expected testimony would have been "[a]bsolutely harmful" because his client told him he was at the schoolyard for "a couple hours" prior to the fire so "[t]here's just no possible way, based on what he told me, there's no way I want to put him anywhere inside that building whatsoever. I want to put him outside that building where he could possibly be yelling threats to people, and I certainly don't want to put him inside that building."[3] *Id*. at 158-59. In response to questions from the court, Strunk clarified that evidence placing his client in the building 45 minutes before the fire "could lead to maybe he's over there threatening people or why is he in the building." *Id*. at 160.

In addition, Strunk believed that Taylor's testimony that Mosley was in the schoolyard with children and male adults, but no females undermined Coward's testimony that she, other adults of both genders, and children were at the schoolyard. Strunk also believed that if a witness in a position to hear threats made outside the building testified that she did not hear any threats, it would harm the defense case, which placed Mosley across the street in the schoolyard,

---

[3] Strunk testified that he believed that crass remarks made from the schoolyard would not expose his client to liability for instructing others to commit arson. Fed. Tr. 154. In context, this court believes that Strunk's reference to "put[ting Mosley] outside that building where he could possibly be yelling threats to people" meant Strunk wanted to present Mosley, at worst, as a callous individual who may have made tasteless remarks about the fire when he was at the schoolyard.

by indicating that Mosley could have been in front of the building close to the time the fire started.

## III.    Discussion

### A.    Standard of Review

A habeas petitioner is entitled to a writ of habeas corpus under 28 U.S.C. § 2254 if the challenged state court decision is either "contrary to" or "an unreasonable application of" clearly established federal law as determined by the United States Supreme Court. *See* 28 U.S.C. § 2254(d)(1); *Williams v. Taylor*, 529 U.S. 362, 404–05 (2000). The parties agree that the "unreasonable application" prong of § 2254(d)(1) is at issue in this case. To prevail under this prong, Mosley must demonstrate that although the state court identified the correct legal rule, it unreasonably applied the controlling law to the facts of the case. *Williams*, 529 U.S. at 407. A state court's application of Supreme Court precedent rises to this level if it was "objectively" unreasonable. *Harrington v. Richter*, — U.S. —, 131 S.Ct. 770, 786 (2011) ("even a strong case for relief does not mean that the state court's contrary conclusion was unreasonable").

### B.    Mosley's Ineffective Assistance of Counsel Claim

This case turns on whether the state court unreasonably applied Supreme Court Sixth Amendment jurisprudence to the facts. The well-known *Strickland* standard governs whether counsel's performance is constitutionally ineffective. *See Strickland v. Washington*, 466 U.S. 668, 687-91 (1984). Under the first prong of *Strickland*, Mosley must show that his counsel's representation fell below an objective standard of reasonableness. *Id*. at 687-88. The second *Strickland* prong requires Mosley to establish there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Id*. at 694.

This court and the Seventh Circuit both previously held that assuming the affidavits from Taylor and Jones were true, the state court's rejection of Mosley's ineffective assistance claim was objectively unreasonable. Based on the more developed record before this court, the court adheres to this conclusion.

### 1.  Performance

"[T]he performance standard provides significant latitude for permissible attorney conduct" so a habeas petitioner "must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Mosley v. Atchison*, 689 F.3d at 847-48 (quoting *Strickland*, 466 U.S. at 689) (internal quotation marks omitted). Here, the state court held that Strunk's decision not to call Taylor and Jones as alibi witnesses was reasonable because their testimony would have been cumulative to Coward's testimony and bolstered the state's case by placing Mosley near the building when the fire started. For the following reasons, this court disagrees.

### a.  Would Taylor's and Jones' Testimony Have Been Cumulative?

To briefly recap, Fernando testified that Mosley was in front of the building shortly before the fire started and ordered two boys to "burn this motherfucker down." Ledbetter testified that when the fire started, she heard people yelling "fire, fire, fire," went to the window, saw Mosley ran past, and heard him yell "burn this down." After his motion for a directed verdict was denied and Fernando was not available to call as part of the defense case due to the failure to subpoena her ahead of time, Strunk decided to call Coward, had his investigator locate her so she could testify, and met with her.

Coward testified that Mosley was at the schoolyard from approximately 7:00 to 7:30 p.m until the fire started at 10:30 p.m. Coward's testimony about the critical issue in the case – Mosley's location when the fire started – was conflicting as she testified that after the fire started, he ran across the street towards the burning building *and* stayed in the schoolyard. The record shows this inconsistency did not go unremarked as at the conclusion of Coward's direct testimony, the trial judge asked her to clarify whether Mosley left the schoolyard after the fire started. Coward said Mosley stayed in the schoolyard but later testified again that he crossed the street with the rest of the group from the schoolyard after the fire started. Before sentencing Mosley, the trial judge noted he did not believe Coward's testimony that Mosley was in the schoolyard for at least three hours before the fire started.

Strunk was aware of both Taylor and Coward before trial, as he listed them as potential witnesses in May of 1997 and asked an investigator from his office to interview them. Taylor testified she was not interviewed, and Strunk's file does not contain any notes regarding interviews of Taylor or Coward, although his practice was to memorialize favorable potential testimony in writing. This court finds that if called as a trial witness, Taylor would have testified that Mosley was in the building 45 minutes before the fire and then was across the street in a group of men and children at the time the fire started.

Based on the court's evaluation of Taylor's and Strunk's testimony during the evidentiary hearing, it finds that counsel did not call consider calling Taylor because he was not aware of her likely testimony even though prior to trial, he was aware that she was a fact witness. Thus, Strunk did not reject Taylor as a potential witness because he thought her testimony was cumulative. This means that the decision to refrain from calling Taylor is not entitled to the

presumption of reasonableness that normally applies to strategic decisions.  *See Mosley v. Atchison*, 689 F.3d at 848 ("The consequences of inattention rather than reasoned strategic decisions are not entitled to the presumption of reasonableness") (collecting cases).

This conclusion is supported by Strunk's conviction that the trial court would completely reject Fernando's testimony and thus have no choice but to grant a motion for a judgment of acquittal.  Strunk opined that Fernando was "nasty," "one of the worst witnesses" he had "ever seen as far as demeanor and arrogance," and "incredible from the start."  Fed. Tr. at 155.  Consistent with this world view, during the evidentiary hearing before this court, Strunk repeatedly stated that "no evidence" showed that Mosley conspired with the two juveniles who set the fire.  *Id*. at 152.

Specifically, Strunk testified:

—  "There's not a shred of evidence, and there isn't today, that they introduced at that trial that Christopher Mosley ordered this, that Christopher Mosley told those kids to do this."  *Id*.

—  "There was no evidence adduced at this trial that Christopher Mosley aided and abetted anything."  *Id*.

—  "[W]e're going to beat this case because you're not accountable.  They can't prove you aided and abetted anything because they have no conversations with you and these two juveniles."  *Id*.

—  "There was no evidence whatsoever that [Mosley] ordered those juveniles to set this fire."  *Id*. at 194.

Given this mindset, the court believes that analyzing whether Strunk thought, before or during trial, that Taylor or any other potential witnesses was cumulative to Coward requires it to engage in revisionist history.  Strunk put all of his eggs in one basket by preparing his case based on his firm conviction that the trial court would reject Fernando's testimony in toto.  Once that

did not happen, he did not have a premeditated Plan B, asked for a brief continuance, located Coward, and put her on the stand. The state court's finding that Strunk rejected Taylor because he believed her testimony was cumulative to Coward's is thus objectively unreasonable because it is based on incorrect assumptions about the chain of events leading to Coward's appearance on the stand as the sole defense witness.

Moreover, the state court's conclusion that Taylor's testimony was cumulative is unreasonable. Fernando, Ledbetter, and Coward testified on the ultimate question of Mosley's whereabouts immediately before the fire. Coward was not an ideal witness given her shifting testimony. On cross-examination, Strunk did not inquire about Fernando's drug dealing, her personal animosity against Mosley, or the basis for her statements about the Gangster Disciples because he did not want to highlight the Fernando-Mosley feud (even though this would have impeached Fernando by providing a reason for her to lie) or Mosley's gang membership (even though it was a bench trial and this fact was already in evidence).

As noted by the Seventh Circuit, "the location of the defendant [was] critical to the case and there were problems with the testimony of the sole alibi witness." *Id.* Testimony placing Mosley in the building 45 minutes prior to the fire but in the schoolyard at the key moment – immediately prior to the fire when Fernando said she heard Mosley order the boys to start the fire – is directly relevant to the central issue in this case. In addition, the need for corroboration was especially important since Coward's testimony on this key issue was inconsistent and Strunk decided to refrain from impeaching Fernando in any meaningful way. It thus was unreasonable for the state court to find that Taylor's testimony would have been cumulative. *See id.*

Keely Jones, like Coward, would have placed Mosley in the schoolyard with a group of men, women, and children at the time the fire started. The court finds that her testimony about meeting Strunk and offering to testify was credible. On the other hand, it also believes that Strunk would have listed her as a potential witness in his discovery responses had he known she was a fact witness. The court need not resolve whether Strunk was aware of Jones prior to trial because the state court's belief that Taylor's testimony would have been cumulative is sufficient to establish that it unreasonably applied *Strickland*'s performance prong.

### b. Would Taylor and Jones' Testimony Have Bolstered the State's Case?

The state court's conclusion that Strunk did not call Taylor and Jones as alibi witnesses because they would have bolstered the state's case by placing Mosley near the building when the fire started is unreasonable because it was based on incorrect assumptions about counsel's strategy. Shortly before the fire started, Mosley was unquestionably "near" the building as he was either in front of it or across the street from it. This court finds that Taylor would have testified that Mosley visited her on the night of the fire but left approximately 45 minutes before the fire started and went across the street to the schoolyard. On the other hand, Fernando testified that shortly before the fire started, Mosley was in front of the building commanding his associates to burn it down.

Taylor's testimony that Mosley had departed 45 minutes beforehand and was at the schoolyard would not have bolstered Fernando's testimony as it is at odds with Fernando's version of events.[4] Similarly, Taylor's testimony that she was in a position to hear people

---

[4] To the extent Taylor's testimony can be interpreted as bolstering the state's case, it does so in a way favorable to Mosley. Ledbetter testified she noticed "people were yelling fire, fire,

speaking loudly outside the front of the building but did not do so casts further doubt on Fernando's "burn this motherfucker down" testimony.   The state court's conclusion that Strunk decided not to call Taylor because her testimony would bolster the state's evidence is thus objectively unreasonable because it is based on incorrect assumptions about the facts. Accordingly, the court finds that Mosley has shown that his counsel's representation fell below an objective standard of reasonableness.  It thus turns to the prejudice prong of *Strickland*.

### 2. Prejudice

The Illinois Appellate Court found that the failure to present additional alibi witnesses did not affect the verdict "as they merely could have placed defendant across the street at the time of the offense.  Because defendant's presence at the scene of the crime was not necessary to convict him based on accountability, we agree that Jones' and Taylor's testimony would not have affected the outcome of the trial, and therefore, defendant was not prejudiced by counsel's decision not to call them as alibi witnesses."  *People v. Mosley*, No. 1-03-134, at 13.

The Seventh Circuit agreed with this court's conclusion that "the state appellate court's decision was, in the terms of § 2254(d)(1), 'contrary to' *Strickland* because it required Mosley to show that the result *would have* been different," explaining that "*Strickland*'s prejudice prong actually requires that the defendant show 'there is a *reasonable probability* that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Mosley v. Atchison*, 689 F.3d at 850 (quoting *Strickland*, 466 U.S. at 694) (emphasis in original); *see also Williams v. Taylor*, 529 U.S. 362, 405–06 (2000).  Because the state court applied an

---

fire," and then went to the window and saw Mosley standing below "yelling burn this down." Thus, both Taylor and Ledbetter placed Mosley in front of the building after the fire had started.

incorrect standard, this court considers *Strickland*'s prejudice prong *de novo*. *Id*. at 850-51

(citing *Martin v. Grosshans*, 424 F.3d 588, 592 (7th Cir. 2005)).

The court thus asks whether there was a reasonable probability the outcome would have

been different but for counsel's errors. The Seventh Circuit has held that:

> A reasonable probability is a probability sufficient to undermine confidence in the
> outcome. In weighing the effect of counsel's errors, the court must consider the
> totality of the evidence before the judge or jury. Consequently, a verdict or
> conclusion that is overwhelmingly supported by the record is less likely to have
> been affected by errors than one that is only weakly supported by the record.

*Id*. (internal quotations and citations omitted); *see also Harris v. Thompson*, 698 F.3d 609, 646

(7th Cir. 2012) (the prejudice prong of *Strickland* "is met when defense counsel's deficient

performance causes critical exculpatory testimony to be absent from trial" and there is a

reasonable probability that the missing evidence would have changed the outcome).

This court agrees with the Seventh Circuit's observation that "two findings were central

to the verdict: (1) Mosley was in fact under Fernando's window before the fire was set, and (2)

he in fact told the two younger boys to 'burn this motherfucker down.'" *Id*. at 852. The

evidence supporting these two critical findings was "not overwhelming." *Id*. at 851. Fernando

was the state's star witness regarding the source of the fire. Although the lack of cross-

examination did not highlight her bias against Mosley, it is undisputed that Fernando and Mosley

had an acrimonious relationship and were in the middle of an ongoing fight about drug sales.

Moreover, as this court previously held:

> Fernando's testimony presents an almost impossible factual scenario. First of all,
> if Fernando's version of events is to be believed, the following must have
> happened: in the time it took her to walk from her bathroom (where she allegedly
> heard Mosley say "burn the motherfucker down") to her living room, the two
> boys who lit the fire ran from below her window (where they were allegedly
> getting the directive from Mosley to start the fire) into the apartment building, ran

up the stairs to the second floor, poured gasoline in the opening to the second floor hallway, and lit the fire. Fernando claimed that when she looked out her living room window and identified Mosley, she saw a group of people running towards her building from the schoolyard yelling that the building was on fire. So, in the time it took Fernando to walk from her bathroom to her living room, Mosley gave the directive, the boys ran into the building, threw the gasoline, lit the fire, and the fire progressed so that smoke was visible to the crowd of people across the street in the schoolyard.

*Mosley v. Atchison*, 689 F.3d at 851-52 (quoting *United States ex rel. Mosley v. Hinsley*, No. 05 C 248, 2011 WL 3840332, at *4 (N.D. Ill. Aug. 26, 2011).

As with the performance prong, the prejudice prong, in this court's opinion, is inexorably tied to Strunk's belief that Fernando's testimony was so facially incredible that he did not need to: (1) cross examine her vigorously when the state presented her as a witness; or (2) develop a defense case ahead of time. Once the trial judge denied the defense's motion for a judgment of acquittal, Strunk was forced to forge on and formulate a defense. At that point, he could not step back in time and focus more carefully on other witnesses or attempt to discredit Fernando more vigorously. In addition, as discussed above, he was not aware of Taylor's testimony even though he knew she was a fact witness. Strunk directed his investigator to locate Coward and moved ahead with her as the sole defense witness even though Taylor (and potentially other witnesses) could have provided corroborating evidence on the central issue of Mosley's whereabouts at the time the fire started.

The trial judge appears to have shared this court's concern about trial preparation, stating he was "somewhat troubled by the way that the case of Christopher Mosley was tried overall" because:

sometimes one side or the other either overevaluates their case or under-evaluates their case. The entire transcript of the trial of Christopher Mosley if you put it all together would be give or take 75 pages or so. It doesn't mean it's a slight to Mr.

-26-

> Struck, not suggesting he was ineffective or not. But I'm just suggesting this, that perhaps in any given case, perhaps in the case of Christopher Mosley, one side or the other will often times either under-evaluate the evidence in the case or over-evaluate the evidence in the case. And maybe that occurred in this case regarding the evaluation of the evidence against Mr. Christopher Mosley.

State Tr. F13-14. The trial court then concluded that based on the evidence before him, he was convinced Mosley was guilty beyond a reasonable doubt.

Strunk is an experienced and highly qualified member of the criminal defense bar. During the evidentiary hearing, this court was impressed by counsel's zealousness in connection with Mosley's defense. For example, despite the passage of time, he vividly recalled his negative impressions of Fernando when preparing for Mosley's trial. It was clear to this court that these impressions were the driving force behind his trial preparation. Ultimately, however, the court finds that the totality of the evidence before the state trial judge demonstrates a reasonable probability that Taylor's testimony placing Mosley in the schoolyard immediately before the fire would have changed the outcome of the trial.

The court also expresses its strong disagreement with the Illinois Appellate Court's view that testimony from additional alibi witnesses would not have affected the result because "they merely could have placed defendant across the street at the time of the offense." *People v. Mosley*, No. 1-03-134, at 13. As Strunk correctly recognized, if Mosley was in the schoolyard when the fire started, he could not have been standing in front of the building exhorting his alleged associates to burn it down.

Similarly, the Illinois Appellate Court's statement that Mosley's "presence at the scene of the crime was not necessary to convict him based on accountability," *id*., demonstrates a fundamental misunderstanding of the underlying facts. The state's theory was that Mosley told

-27-

the juveniles to burn the building down immediately before the fire started. In other words, the state did not allege that Mosley ordered the juveniles to start a fire well ahead of time. Thus, Mosley's presence at the scene of the crime when the fire started was precisely what was necessary to convict him based on accountability.

Accordingly, the state court's summary rejection of the putative alibi witnesses' testimony placing Mosley in the schoolyard when the fire started is an unreasonable application of clearly established federal law as determined by the United States Supreme Court. *See* 28 U.S.C. § 2254(d)(1). Because the failure to call Taylor as an alibi witness is sufficient to undermine confidence in the verdict and the state court's application of *Strickland* is unreasonable, the court need not consider the impact of Jones' potential testimony or delve into counsel's decisions about cross-examining Fernando or subpoenaing her.

**IV.    Conclusion**

For the reasons set forth above, the court grants Mosley's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The respondent shall release Mosley from custody unless, within 30 days from the entry of this order, the State of Illinois announces its intention to retry him or files a notice of appeal. The clerk is also directed to substitute Rick Harrington as the respondent. Finally, the court recognizes that appointed counsel (Michael Brody, Richard Franch, and Keith Porapaiboon of Jenner and Block LLP) have dedicated a very significant amount of time to representing Mosley in this case. The court thanks counsel for their thorough and diligent work and commends them for their excellent service, both to their client and to the court.

ENTER:

-28-

_____
JOAN B. GOTTSCHALL
United States District Judge

DATED: March 25, 2013